Thank you very much, Your Honor. Vicki Podboresky on behalf of Defendants Helens, Thomas Sullivan and Thomas Ribbon. Your Honors, I'd like to address in the time I have the first several counts of the indictment which deal with the mail fraud and wire fraud as well as the variance argument that was raised on appeal. I think this case is a very interesting case as far as it goes with respect to whether or not a breach of contract actually crosses the line and becomes fraudulent conduct. I asked the Court to look at the Second Circuit case of D'Amato for some guidance in this area and in that D'Amato says that you can't just have a mere breach in order to prove a fraud. You need something more, otherwise you're going to eviscerate the difference between what's a fraud and what's a breach. And D'Amato says, and I think... Counsel, let me, you may or may not know, I used to be a business lawyer. I do, Your Honor. And very familiar with contracts and the way businesses run and I understand your argument about that this was just a breach of a contract. But your client, at least Mr. Rubin, was accused of taking millions and millions of dollars out of an insolvent company under any standard to pay personal bills. How does that fit? How can that be treated as a breach of contract? Well, I think at the foundation of what's at issue is that whose money was it? I think that the government is... Well, let's just say arguendo, that you're correct, that this is the pattern in the industry and people take this in and they have their expenses and then they pay. Even under that pattern, when you have an insolvent business, as you well know, there are certain things you can't do under California corporate law or under securities law or anything else. And it appears that your clients did that in spades. Well, in January of 2000, at that point in time, there was a significant amount of money at Focus Media, at the defendant's company. And as a matter of fact, the evidence shows that $14 million approximately went out to pay for media outlets that had aired time for the customers. So at that particular point in time, there was a significant amount of cash in the company. But there were far more debts than there were assets, even at that point, right? That's true. In a bankruptcy sense or an insolvency law, clearly the company was insolvent at that point.  However, if the money that came in from the customers, Sears, Universal, and other Focus customers, is treated by Focus as its income and its money in total, which is how Focus did it, that's what they did. Their position is that they bought airtime or secured airtime as their asset and then turned around and sold it to their customer who paid Focus for it, as well as for reconciliation and post-analysis services. At the core of the contract between Focus Media, the defendant's company, Mr. Rubin's company, and Sears and Universal is a contract for services whereby Focus and the defendants would agree to get airtime to Sears and Universal, reconcile that airtime, make sure it all had run properly, and then to do a post-analysis. There wasn't a written contract, was there? There was not a signed written contract. There was a proposed contract that came into evidence, one that Sears had drafted. And I think as the evidence showed, it pretty much mirrored how the parties acted with each other over a number of ten years. So that wasn't signed, and also the, shall I call it, industry standard approach from the media, those contracts weren't signed either, right? No, they were not. So you have an oral contract, in effect, involving tens of millions of dollars. Yes. What's the standard here? Don't we just fall back on regular insolvency law here? No, I don't think that you fall back on insolvency. What law do we fall back on? I think that you look to the practices of the parties in their relationship as an implied contract, as an oral contract, how they behaved over the course, because we have 10 to 11 years of practice. Okay, don't you have to be careful that that argument doesn't get you into some difficulty? What they did here toward the close of the business was not what they normally do. But what normally occurred in the business relationship changed right at the end of the time period we're talking about, because at that point in time, what happened was Sears announced that it was terminating its relationship with Focus. It then immediately sued Focus for a breach of contract. Focus turned around and sued Sears for a breach of contract. And then Sears sent a letter to 15,000 media outlets saying, do no more business with Focus Media any further from this day forward. So everything changed dramatically at that point in time, which then prompted Focus to act in a manner that was totally different as how it had acted in the 10 previous years it had with Sears or Universal. Are you saying that prior to the date that Sears and Focus went their separate ways, that it was the pattern of Mr. Rubin to have his personal income taxes paid out of loans from Focus and to pay for his personal airfare first class to Paris and to pay his children's expenses and his dentist's expenses and his taxes? Was that going on before Sears stopped? There was evidence presented at trial that a portion or some of Mr. Rubin's expenses, although not in specific detail. But it was de minimis, right? I don't really even think it was de minimis. The government's proof at trial was that Mr. Rubin took a large salary in the form of either loans or payment for personal expenses through the company over the years. When the personal taxes were paid at that point in time, that was April of 2000. Litigation had already ensued in the case. And Focus had taken the position and Mr. Rubin had taken the position that that money was mine. What I'm trying to understand, counsel, is following up on Judge Ferris' question. To some degree, you're kind of building a little box from which you can't escape. Because if the pattern, if this is an oral contract and the pattern previously was that Mr. Rubin did none of these things before Sears, from your perspective, breached its contract, then, in fact, he changed the contract once Sears did that, didn't he? Well, I think that... Take the personal income tax. Does the record show that Mr. Rubin ever used a loan from Focus to pay his personal income tax, say, in 1998? Not that I'm aware of. Or 1999? No. So he only did that after the breach of contract occurred. What about the, what was it, a $35 million loan or something like that? Was that ever done before? I don't believe there was a $35 million loan. Maybe that's the aggregate of what he took out. That's the aggregate amount of what's at issue. And some portion, actually, of that $35 million is what's at issue. Okay. Save that thought because your two minutes is here. So we'll hear from your co-counsel, and then, after the government, we'll look forward to hearing your rebuttal. Thank you. Good morning. I'm Michael Rounds, and I represent the appellant Jeffrey Mousseau. I'd like to begin my comments this morning with the issue of prosecutorial misconduct. One of the key pieces of evidence in this case, in fact, I believe it was the most central piece of evidence relied upon by the government, was the December 8th facts from Mr. Mousseau to Mr. Stolman, who was representing focus in the bankruptcy. The testimony at trial by Mr. Stolman through Exhibit 641 was that he could not read the pages that had the key $250,000 transfers because they were not legible. However, they were legible in Exhibit 680, and we've shown that to the court in our brief. The argument to the jury in closing argument was this. The facts that Mousseau sent to him didn't contain those transfers. Well, we know it did because it clearly was shown in Exhibit 680. Also significantly is the government knew that statement was false. The most the record showed in this case is that Mr. Stolman testified in Exhibit 641 that those pages weren't legible and that he didn't read them. So the government's argument to the jury was absolutely false. It was not supported by this record for two absolutely compelling and undisputable reasons. Number one, it clearly was in Exhibit 680, and number two, that's not what Mr. Stolman testified to. Now, this was a long trial. That's correct. However, the issues concerning Mr. Mousseau were quite discreet, and this evidence was central to the government's case. That's what they argued. It was knowingly wrong, and the jury convicted Mr. Mousseau. You don't think that's the reason, do you? Does this record show that there are other bases for the conviction of Mr. Mousseau? There's other evidence in the record, but the court can look at the closing arguments and the way this case was presented through the witnesses. This was the central piece of evidence that was relied upon by the government. There are certain things that nobody can ever know, and unless you've got something that I haven't seen in the record, we don't really know precisely why the jury convicted, but we do know that the record shows, doesn't it, that money was passed through a special trust account of Mr. Mousseau's and that there was a legitimate reason for the money to pass through, and that legitimate reason would be so that the source of the funds could not be known? Doesn't the record show that? Absolutely not, Your Honor. And the reason is, the reason is we've been reading two different records. I don't think we are, and let me explain to the court. The reason is, is because if you look at Exhibits 641 and 680, what those disclose to Mr. Stolman is all the transfers that were made by focus. So what was conveyed to Mr. Stolman was, hey, I received two $250,000 transfers from focus. He disclosed that to Mr. Stolman. Was there anything in this record that would cause the triumphant to believe that Mr. Mousseau said that the money was his? Well, Your Honor, even the government says that all Mr. Mousseau was referring to in that comment is that it came from his trust account. The statement wasn't that the money is mine. All I'm asking you is, was there anything in the record that would permit a triumphant to conclude that Mr. Mousseau had stated that money, which was clearly focus's money, was his money? Well, I believe that if that was taken literally from Exhibit 641, that could be a conclusion. That is not what the government argued to the jury, and it's not what they're saying to this panel. No, but maybe I misunderstood you. I was thinking you said that there was no basis for triumphant to find guilt on the part of Mr. Mousseau. And when we review, and that's what we do, we look at the record to see what is there. Is there a basis? And the questions that I was asking you were questions that, as a person sitting in judgment, I would have some question about. I would think a triumphant might reach certain conclusions. And your opportunity now is to tell me why that's wrong. Let me be very specific with the Court. This evidence was highly material in the foundation for three counts, Counts 9 and 10, Fraudulent Concealment, and Count 25, the False Oath of Bankruptcy. However, when evidence that is put into the record is false, it taints the entire trial. This was a central piece of evidence relied upon by the government. And the Court can find, based upon the conduct of the government in this case, based upon what's very clear in the record and what they said to the jury, that there was prosecutorial misconduct. And if that's proven and there's plain error, that's the end of the ball game. This case ought to be remanded for a new trial for that reason. But, counsel, in this instance, isn't it correct that Ted Stolman testified that he made it very clear to Mr. Mousseau that he would not accept a retainer from FOCUS? Isn't that correct? That's what Mr. Stolman testified to. All right. Isn't it also true that Mr. Stolman indicated that he was told by Mr. Mousseau that those funds that were being transferred from his trust account were his personally? I don't believe the latter is correct, Your Honor. What Mr. Stolman said was that Mr. Mousseau had advised him that it was coming from Mr. Rubin. That was Mr. Stolman's testimony. Well, let's take it that way. It wasn't FOCUS's money, right? That's what he said Mr. Mousseau represented to him. But even if he said it was Mr. Rubin's money, that was false, wasn't it? Well, Your Honor, that issue goes away based upon the clarity of this exhibit, because Mr. Mousseau did show where the money came from. He told Mr. Stolman, it's from my trust account. It's very clear from looking at the document that the original source was FOCUS. It was up to Mr. Stolman at that point to take that issue up with Mr. Mousseau, and he never did. Doesn't the record also show that once Mr. Stolman and Stutman, Treaster, and Glatt knew that this money had come from FOCUS, that they withdrew? Actually, no. It's not true? It's not. Okay. They did not rely upon the $250,000 transfers to withdraw from this case, and the reason is because Mr. Stolman testified that it was illegible. So the reason that he ultimately withdrew. If we may, just for a moment. Is it clear from the record that Mr. Stolman had an understanding from his communications with Mr. Mousseau, whether or not from the fact sheet, that the money did not belong to FOCUS? I don't think that testimony was credible, Your Honor. Okay. Well, that may not have been, but once he knew that it was, he withdrew? No. He withdrew because with respect to the legible portions of the document, he could see that FOCUS made some payments on October 27th that were contrary to what Mr. Sullivan had said in his declaration to the court. The record ---- Hold that thought again. We'll give you a full two minutes. We're now going to hear from the government. Thank you very much, Your Honor. Good morning, Your Honors. May it please the Court. I'm Ronna Katzenstein, United States Attorney, on behalf of the government. I'll be discussing the sufficiency challenges raised by all defendants, and my colleague, Paul Stern, who's also an assistant United States Attorney, will address the other issues raised. How much time will Mr. Stern be taking? Your Honor, I think I will begin by addressing the challenges to the mail fraud, wire fraud, and related conspiracy counts, and then I'll let Mr. Fraud ---- Mr. Stern. We won't attribute that attribute to you, Mr. Stern. Oh, dear. Okay. And Mr. Stern will address the arguments made by Mr. Rounds on behalf of Mr. Pritzker. Mr. Stern will be firm in his claims against fraud. He certainly will. And then if there are questions with respect to the sufficiency of the bankruptcy counts, I will come back and address those. In her argument, Ms. Poborewski made a couple of points with respect to the sufficiency of the evidence on the first set of fraud counts in the indictment, which I'd like to address. Let me just say, the indictment charges that between November 1999 and November 2000, Mr. Rubin and Mr. Sullivan engaged in a scheme to defraud focuses advertising clients and the media outlets of some $35 million that the clients had sent to Focus for the purpose of paying for the ads run on behalf of the clients and to be paid to the media outlets. The evidence showed, and I don't think there's a dispute with respect to this, that Focus, as Judge Smith pointed out, Focus was insolvent at the time that it obtained these funds from its clients, that at that time it knew that Universal was going to terminate using Focus's services, thereby exacerbating the dire financial straits that Focus found itself in, and that Sears, at that same time, had put its account into review, further stress on the financial status of the company. The company was insolvent because Rubin and Sullivan had together been transferring millions and millions of dollars that were designated to be paid over to the media outlets to Mr. Rubin's DBA, to Tom Rubin and Associates, which Mr. Rubin then used for his personal expenses. It was designated to be used for the media outlets through the custom and practice of the industry. It is true that these are all oral contracts that are being used, but the custom and the practice of the industry, as the testimony at trial demonstrated, was that the invoices, the money that was paid into Focus was paid pursuant to invoices which specified the ads that money would be used to pay for. And indeed, the invoices from Focus segregated out those funds to be paid from an agency fee, so designated as an agency fee. We also had testimony from the media outlet witnesses that when they submitted, when they submitted, for whom those ads were going to be run, and the invoices from the media outlets to Focus, which were in evidence at trial, were addressed to Sears' care of Focus media. So the custom and the practice of the industry was that the money was obtained for the purpose of paying it over to the media outlets. We also know from the testimony that the money which was obtained on the implicit promise that it would be paid over to the media outlets was not in fact so paid. Now, Ms. Poborewski says that the only reason it wasn't paid was because Sears came along and breached its own contract in February of 2000. In fact, the testimony was, A, that the money obtained from Universal hadn't been paid at all. None of the monies were paid over in January, having nothing to do with what Sears had done. And secondly, with respect to Sears, money in depth from Warner Brothers testified that $1.8 million due for Sears' ads in January was not paid, and that's before the alleged breach that supposedly caused the nonpayment of $23 million because $1.7 million hadn't been paid over by Sears. We also know, the evidence also showed that this money was in fact used to pay the personal expenses of Mr. Rubin. It was done in violation of court orders, thereby giving the lie to the notion that this is merely some sort of commercial dispute and breach of contract which is devoid of any intent to defraud. The payment in violation of court order, which court order are you referencing? There was a temporary restraining order entered in March of 2000. By which court? By the Superior Court of California prohibiting the expenditure of Sears funds. There was a subsequent temporary restraining order and preliminary injunction entered with respect to This arose out of one of the claims, I guess cross litigation at that point, right? In the civil lawsuits. That's correct. So simultaneously with telling the clients I can't pay the media outlets because of these restraining orders, Mr. Rubin and Mr. Sullivan are expending those funds on their own personal affairs. If you know it right offhand, counsel, can you cite to the record where we could find a copy of that 2000, March 2000 injunction? I'm not sure it's in the GER, but I will provide a letter to the court with that information. I would appreciate that. And I'm going to let my colleague, Mr. Stern, address that. Yes, yes. Don't bring Mr. Fraud with you, Mr. Stern. I'll try not to, Your Honor. May it please the Court. I will address the cross misconduct claim. As I understand it, the defendant is arguing that the prosecutor here, who is me, committed misconduct by arguing that Defendant Mousseau failed to disclose information pertaining to those two $250,000 transfers when I knew otherwise and that I somehow hid those facts from the jury. That's flat-out wrong. I would submit to you, if you look at, it is true that I used Exhibit 641 to examine the witness, but if you look at Exhibit 680. I gather you were the trial lawyer. Correct. I made the closing argument. Okay. 680 is just as illegible. Exhibit 680, which is at the defendant's excerpt of record, ER, by coincidence, 680, is just as illegible. The two transfers cannot be found by the naked eye in those. He did not fax a blow-up to Mr. Stolman. He faxed, set eight pages altogether, including a cover page. Some of those pages were legible and clearly contained transfers. This page is a bunch of dots that somebody who doesn't know that there were two $250,000 transfers would be able to read. There was no blow-up admitted into evidence at the trial. Frankly, there's no foundation for the blow-ups that are in appellant's opening brief. We don't know where those came from. And I can represent to the Court now, I did not know that a blow-up of this would have shown anything other than the documents to the ordinary eye. Now, in addition, I would submit this is to be reviewed on plain error. The December 8th fax and the statements to Mr. Stolman on December 8th were not charged as a substantive count in this indictment. They're referenced in an overt act as part of the conspiracy, and they're referenced only in connection with Mr. Stolman's false representation in his 329 statement on January 17th, that to the best of his knowledge, the funds that were used for the retainer did not come from the alleged debtor. Mr. Stolman testified at trial that, among other things, the reason he made that false statement was he was relying on several things that Mr. Mousseau did, including the December 8th fax. And I'd like to reiterate, because I think my representation that Mr. Mousseau lied about the source of these transfers to Mr. Stolman is not simply based on this fax. It's based on a series of events that all show that Mr. Mousseau deliberately concealed the source of the retainer from Mr. Stolman. And I'll itemize those for you. First of all, something that the appellant doesn't address at all is its unrebutted testimony that when this all came about to begin with, Mr. Mousseau lied to Mr. Stolman and said, don't worry, the money's not coming from FOCUS. It's coming from Mr. Rubin. And, in fact, they negotiated the payment in two installments because Mr. Rubin wasn't going to get any money until January. So they were going to pay $250,000 in October and then another. Mr. Stern, I know from having dealt with Stutman, Treaster, and Glad over the years that they always document their retainer agreements. Was the retainer agreement in this case put in evidence? Yes, it was, Your Honor. And what, if anything, does that say about the source of the funds that they were receiving? The retainer agreement clearly states that the source of the funds cannot come from the debtor. Okay. Does it say that they represent that they didn't come from the debtor or not? The agreement is executed, and it's a condition of the receipt of the retainer that it not come from the debtor. Moreover, it also says that Stutman, Treaster, and Glad will not be representing Mr. Rubin or Mr. Sullivan. They'll only be representing FOCUS, which goes to the false statements about the indemnification agreement, which Mr. Mousseau makes later. Do you remember in the record, and if not, maybe you can add it to the 28-J letter, that your counsel is going to send in where the Stutman, Treaster, and Glad retainer agreement is in the record? I think it's Exhibit 635, but we will confirm that. If you would, please. Certainly. In terms of this series of events, so first there's a negotiation. The testimony is there's a negotiation of the terms of the retainer. Mr. Mousseau, by the way, in a letter says, Pursuant to our agreement, here's the check. And Mr. Stolman says, and that's, I think, Exhibit 625. And Mr. Stolman says the agreement was the money wasn't going to come from FOCUS. And second, and importantly, there was a letter that was sent by the trustee on October 30th asking Mr. Stutman for or now representing the debtor for all evidence of any transfers that FOCUS made in the preceding year. Mr. Mousseau's own billing records show he read that letter on October 30th. And Mr. Mousseau at that time knew that maybe he didn't know about FOCUS's financial affairs in total, but he had firsthand knowledge from three days earlier that two $250,000 transfers from FOCUS ran through his client trust account. Did Mr. Mousseau tell Mr. Stolman about those two $250,000 transfers? He did not. Now, then there's an issue that comes up about money missing from the FOCUS account. And Mr. Stolman, Stutman, is extremely concerned, Stutman, Treasurer and Grant, Mr. Stolman is extremely concerned that there's been money missing and they've misrepresented facts to the Bankruptcy Court at the October 27th hearing where Mr. Castanara says there's no danger of dissipation of assets. And he asked Mr. Mousseau to provide some financials for what's going on. We need to look at the financials for the gap period. And Mr. Mousseau then faxes Mr. Stolman on December 8th, and in the faxed cover letter he says, and I think it's important to parse the language, he says, as you can see, as you can see by comparing the date of the retainer check to when I received funds from FOCUS, disbursements from FOCUS, the funds used for your retainer are mine. Now, I would submit, I recommend to your honors, look at what is in evidence, not what isn't in evidence, because he didn't fax the blowup and we don't even know how these blowups were produced because they're not anywhere in the record. If you look at what's in the record, what was authenticated by Mr. Stolman as the fax he received, you will see that the only things he can see are two transfers, one for $20,000 on October 5th, a second one for $50,000 on October 27th, from which I think it's a fair inference and I think beyond a reasonable doubt it is clear what Mr. Mousseau is telling Mr. Stolman is, don't worry, even if there's money missing, the funds for your retainer didn't come from FOCUS because, see, look, I got $20,000 on October 5th. I paid you with a check off my client trust account $250,000 on October 26th, so that money couldn't have come from FOCUS. That was mine. It came from my client trust account. I mean, impliedly, it came from Rubin. Rubin transferred $250,000 into my client trust. That's where you got the money. And I didn't use that to pay you because you got that check on October 26th. $50,000 came in on October 27th. So I think it's absolutely clear from the record that Mr. Mousseau attempted to mislead Mr. Stolman, consistent with the lie that he told him when the retainer was negotiated, consistent with his failure to provide any evidence of the transfers when he was well aware that the trustee was seeking them. So I don't know. You don't have to keep going if you don't want to. Well, I just want to make one other point. If you look, if you read the closing argument, where the offending, I mean, the argument about misconduct has morphed. First we tried to suppress Exhibit 680. In fact, we moved it into evidence. And, in fact, counsel in their closing argument argued that Mr. Mousseau had disclosed, looked at the facts on December 8th. They argued that he disclosed everything. They didn't argue it very hard because if the jury had looked at what was faxed to Mr. Stolman, they would have seen it wasn't in there. Nobody can see that. I mean, Mr. Stolman, I mean, maybe if you blow it up and you already know that there have been transfers, you can see little hints of it. But, I mean, the jury would see it wasn't disclosed. What was disclosed clearly, and, by the way, Mr. Stolman didn't just say it was illegible. He said the print was too small. I mean, the fact of the matter is it's an eight-page fax. Mr. Mousseau, it's not like it was, one page was blurry. One page had print that nobody could read. And there's no reason to think that Mr. Mousseau, who sent the fax, didn't know that either. But the place where the statement is made that the transfers are not contained in the fax is actually in connection with an argument at the end of the opening argument when I'm arguing about Mr. Mousseau's fraudulent intent, actually, and I'm not arguing about the December 8th fax. I'm arguing about something Mousseau said to Mr. Castanares, Mr. Stolman's partner, on December 9th. And he's trying to explain, first of all, he's saying, you know, because at that point, the Stolman firm is going to withdraw. It's like, this is ridiculous. All this money is missing. We've misled the bankruptcy court. And so Mr. Mousseau is trying to explain, well, I didn't mislead you. I didn't know about all those transfers on the 27th, he says, which is somewhat plausible because he's not a focused insider. But he says, but he had to have known about the transfers to his client trust account. So he says, well, and he says, but I only learned about the transfer after the hearing on October 27th. That statement only makes sense if Mr. Mousseau knows he hasn't told the Stolman firm about the transfer on the 26th. Because if he's told them about the transfer on the 26th, he needs to explain, and also the second transfer on the 27th, which is before the hearing at 1 o'clock in the afternoon, he needs to explain not just, he can't just say, well, I only learned about that $50,000 transfer after the hearing. What about the one on the 26th? Why didn't you tell them about that one? And that was the one you used to pay their retainer. So, again, we would submit, and that is in that context where I say, if you look at the sentence, the entire sentence, I said Ted Stolman doesn't know about those $500,000 transfers because they're not contained in the December 8th facts. That's what I say. That was Ted Stolman's testimony. Ted Stolman's testimony was he didn't know anything about those transfers because he got a fax, and the only transfers that were contained in that fax, to his knowledge, were the $20,001 transfer on October 5th and the $50,001 on October 27th. If the Court has any other questions, I'd be happy to answer. Thank you very much. Are you going to finish? No, Your Honor. I just want to respond to the Court's question that the retainer agreement is Exhibit 640, which is included in Mr. Mousseau's excerpt of record beginning at page 279. Thank you very much. Very good. Ms. Podereski, are you going to be the first? I am. Replying party? I am, Your Honor. I just asked the Court to take a look at Exhibit 2652, which is a defendant's excerpt of record at page 173, which is not controverted, which shows that almost $14 million is paid out to the media outlets in January of 2000. And there was not $1.8 million that was due and owing in January of 2000. Focus was current on its payments to the media outlets all the way through the fourth quarter and into January of 2000. It's not until February of 2000, by the evidence in the record, that Focus starts to have issues about late payment to the media outlets. Just to be clear, my understanding is that it was Focus's pattern to pay bills at least 90 days late. Is that right? They did not. They had 90-day payment terms. They were not late. But they did have a chronic foot. I thought they had 60-day terms and they paid on average at 90 days. They had 90. They had special terms negotiated for 90 days. Other industry agencies had 60 days, but they had negotiated 90 days. And the court's right. They did on many occasions pay like the 97th day or even the 100th day as a practice throughout the years. That was an issue that they had. But they did pay. And they paid in October, November, December of 1999, according to the media outlets, and in January of 2000. It's not until February of 2000 that there's an issue of collection with respect to the Universal accounts, not Sears. Sears had not come due yet. It's the Universal accounts that came due. And at that point in time, Universal had decided to withhold a half a million dollars from Focus. And that was the testimony at trial. So what I'd like the court to look at is that, yes, Focus was a late payer. But Focus was current on its payments all the way up to the point in time in February of 2000 where everything starts to unravel in this business relationship. It is at that point in time that Focus then acts in a manner consistent with its civil litigation strategy, but not in a criminal. I hate to cut off such enthusiastic advocacy, but we're going to have to do it. Thank you. We have from co-counselor. We know what your position is. Your co-counselor. Thank you, Your Honor. In listening to Mr. Stern's comments, what I did not hear from him was denial that those $250,000 transfers are in Exhibit 688, because they are. It's also very clear when you look at the briefs that we submitted. Are they in the exhibit in such a way that they can be read with the naked eye as they appear in the exhibit? Yes. I think that's what he said. And I believe the record. That's fair, Your Honor. And are you saying that it's the same thing that is in the brief? Yes, I am. The exhibit is just reproduced in the brief? Clearly what we did was we took those particular entries and blew them up so the court could see that they were legible. No, but do they have to be blown up before they're legible? No. And let me explain to the court why. There was four. But you blew them up so that they would be legible to us. Why didn't you just reproduce them as they are in the exhibit? Because we wanted it to be clear to the court what the government knew, and that it was in Exhibit 680 when they made these arguments. And let me just point out to the court that there was four transfers here. One for $50,000, one for $20,000, and two for $250,000. What can be read from that exhibit is the law offices of Jeffrey Mousseau. There was four transfers. Two are clearly in there. The other two are clear. The only thing they could be in the reference to the law offices of Jeffrey Mousseau is those two $250,000 transfers. So it was clear in the evidence that they were in there. You know, your client's case is a tragic case. And it's a cautionary tale for lawyers who venture into bankruptcy and have absolutely no idea what they're doing. And it seems to me that Mr. Mousseau was amongst those. And some of his problems may well have come from that. But hopefully members of the bar will take notice of the fact that when they get into areas that they have absolutely no understanding in, they either have to learn about it in advance or learn with somebody else. But if they wander into these highly technical areas that are overlaid with laws dealing with fraud and misrepresentation, they do so at their peril. And I'm afraid your client was one of those who discovered that. Well, Your Honor, I believe, and I'll just finish on this comment, that, again, the government has to act appropriately in presenting its evidence, and they have to meet the elements of the crimes. And it's our position that they didn't do either. We hear your argument, and we thank all of you for your enthusiastic presentation. The case of United States v. Sullivan et al. is submitted, and this Court is adjourned. Thank you, Your Honor. Thank you.
judges: Farris, Smith, Holland